IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SHAWNDA WATTERSON | ) | CASE NO.: |
| 1736 Sweet Briar Lane | ) | |
| Springfield, Ohio, 45505 | ) | JUDGE: |
| | ) | |
| -and- | ) | COMPLAINT FOR DAMAGES |
| | ) | |
| KAITLYNN BRADFORD | ) | |
| 1008 Olive Street | ) | (Jury Demanded) |
| Springfield, Ohio, 45503 | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| HURRICANE PAIN | ) | |
| MANAGEMENT, LLC | ) | |
| 2200 N. Limestone Street, | ) | |
| Springfield, Ohio, 45503 | ) | |
| | ) | |
| **Serve also:** | ) | |
| Mark Ozimek, Statutory Agent | ) | |
| Statutory Agent | ) | |
| Four Seagate, 9th Floor | ) | |
| Toledo, Ohio, 43614 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| ANSHUMAN R. SWAIN | ) | |
| 174 Lake Bluff Drive, | ) | |
| Columbus, OH 43235 | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs, Shawnda Watterson and Kaitlynn Bradford, by and through undersigned

counsel, as their Complaint against Defendants, state and aver the following:

## **PARTIES.**

1.    Watterson is an individual residing in Clark County, Ohio.

1

2. Bradford is an individual residing in Clark County, Ohio.

3. Hurricane Pain Management, LLC ("Hurricane") is an Ohio limited liability corporation with its principal place of business located in Clark County, Ohio.

4. Swain is an individual who, upon information and belief, resides in Franklin County, Ohio.

## PERSONAL JURISDICTION.

5. Defendants hire citizens of the state of Ohio, contracts with companies in Ohio, and own or rent property in Ohio. As such, the exercise of personal jurisdiction over Defendants comports with due process.

6. Plaintiffs performed work in this judicial district and/or were hired out of this district.

7. This cause of action arose from or relates to events that occurred in this district, thereby conferring specific jurisdiction over Defendants.

## SUBJECT MATTER JURISDICTION AND VENUE.

8. This Court has original subject matter jurisdiction of this case under 28 U.S.C. §§1331 and 1341, inasmuch the matters in controversy are brought pursuant to the FLSA, 29 U.S.C § 215, 216, *et seq* and Section1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

9. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims under the Ohio Minimum Fair Wages Standards Act ("OMFWSA") and the Ohio R.C. § 4112.02(A) because those claims derive from a common nucleus of operative facts.

10. Venue is proper in this District because the wrongs herein alleged occurred in this District.

## STATUTORY COVERAGE.

11. At all times referenced herein, Hurricane formed a single enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r) and formed a single enterprise engaged in

commerce within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), in that said enterprise at all times hereinafter mentioned had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person and in that enterprise had an annual gross volume of sales made or business done of not less than $500,000.00.

12. At all times referenced herein, Swain directly supervised Plaintiffs and was responsible for determining how Hurricane would compensate Plaintiffs for the hours they worked.

13. At all times referenced herein, Hurricane was Plaintiffs' "employer" as that term is defined by Ohio R.C. § 4112.01(A)(2).

14. During all times material to this Complaint, Hurricane and Swain were Plaintiffs' "employer(s)" within the meaning of Section 3(d) of FLSA, 29 U.S.C. § 203(d); Section34a, Article II, of the Ohio Constitution; and the Ohio Minimum Fair Wage Standards Act ("OMWFSA").

## ADMINISTRATIVE HISTORY.

15. Within 300 days of the conduct alleged below, Plaintiffs dually filed Charges of Discrimination with the Ohio Civil Rights Commission ("OCRC") and with the Equal Employment Opportunity Commission ("EEOC"), OCRC Charges Nos. DAY74(47113)02222022 (Bradford) and DAY74(47113)02222024 (Watterson) against Defendants.

15. The OCRC issued both Plaintiffs their respective Right to Sue Notices on November 17, 2022.

16. A true and accurate copy of Watterson's Right to Sue letter is attached hereto as Exhibit "A."

17. A true and accurate copy of Bradford's Right to Sue letter is attached hereto as Exhibit "B."

18. Pursuant to 29 C.F.R. § 1614.407(b) and O.R.C. § 4112.052(B)(2)(b), Plaintiffs have properly exhausted their administrative remedies prior to initiating this action.

19. Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS.

16. Plaintiffs are former employees of Hurricane.

17. Watterson was hired by Hurricane on or about November 23, 2020.

18. Watterson is African American.

19. Bradford was hired by Hurricane on or about May 24, 2021.

20. Bradford is Caucasian.

21. Watterson worked for Hurricane as a Receptionist.

22. Bradford worked for Hurricane as a Medical Assistant.

23. Bradford and Watterson were both hired by Swain.

24. Plaintiff were supervised by Hurricane's Office Manager, Nicole ("Nicky") Grant.

25. Grant is Caucasian.

26. Grant did not participate in the decision to hire Watterson.

27. During Watterson and Bradford's employment, they were regularly exposed to offensive racist, xenophobic, transphobic, and homophobic language in the workplace by Grant and other employees of Hurricane.

28. For example, a Receptionist named Amy Denton regularly complained about others speaking Spanish (such as construction crew that was working near Hurricane's office) by stating "this is America, speak English."

4

29. Grant regularly and openly made offensive remarks about and complained about "Mexicans," "the gays," and other minority groups.

30. Grant and Denton would commiserate about their hateful, racist, homophobic, and xenophobic attitudes on a nearly daily basis in front of Watterson and Bradford.

31. Watterson and Bradford were shocked and offended by Grant and Denton's hateful, discriminatory remarks.

32. In or around June of 2021, Grant made several racist remarks to Watterson, Bradford, and another African American Hurricane employee named Ashlee Johnson regarding the Juneteenth holiday, to include:

    a. Expressing disgust about Juneteenth and complaining that it is a "racist" holiday and that "there is no holiday for white people."

    b. Stating that "slavery was a good thing" and that "we should be grateful for slavery" because "this country wouldn't be anything without slaves."

33. Denton responded to Grant's inappropriate, racist remarks by loudly agreeing with her.

34. Subsequently Plaintiffs and Johnson reported Grant and Denton's inappropriate remarks to Swain ("First Discrimination Complaint").

35. Swain responded to the First Discrimination Complaint by apologizing and assuring Watterson, Bradford, and Johnson that he would "take care of it."

36. The following day, Grant pulled Watterson, Bradford, and Johnson aside and insincerely and sarcastically apologized for "just expressing my opinion."

37. Afterwards, Swain again spoke with Watterson and Bradford about the First Discrimination Complaint and told them that he had "fired [Grant] for about five minutes" before deciding not to terminate her.

38. Swain did not indicate that he had done anything about Denton's inappropriate remarks.

5

39. Upon information and belief, Grant did not dispute making the statements attributed to her in the First Discrimination Complaint.

40. Upon information and belief, Hurricane has a policy prohibiting discrimination or harassment based on race, ethnicity, or sexual orientation ("Discrimination Policy").

41. Grant's remarks regarding Juneteenth violated Hurricane's Discrimination Policy.

42. Alternatively, Hurricane permits supervisors to make remarks approving of African American slavery.

43. Alternatively, Hurricane permits supervisors to make remarks suggesting that African Americans are treated favorably over Caucasians because there is a holiday relating to the end of slavery.

44. Alternatively, Hurricane permits supervisors to complain that "there is no holiday for white people."

45. Hurricane has a policy to investigate reports of unlawful discrimination.

46. Pursuant to Hurricane policy, an investigation of discrimination or harassment should include interviewing the complainant.

47. Pursuant to Hurricane policy, an investigation of discrimination or harassment should include interviewing the subject of the complaint.

48. Pursuant to Hurricane policy, an investigation of discrimination or harassment should include interviewing the subject of the reported discrimination.

49. Pursuant to Hurricane policy, an investigation of discrimination or harassment should include interviewing witnesses to the reported discrimination.

50. Pursuant to Hurricane policy, an investigation of discrimination or harassment should include getting a written statement from the complainant.

51. Pursuant to Hurricane policy, an investigation of discrimination or harassment should include getting a written statement from the subject of the complaint.

52. Pursuant to Hurricane policy, an investigation of discrimination or harassment should include getting a written statement from the subject of the reported discrimination.

53. In response to the First Discrimination Complaint, Hurricane did not interview Johnson.

54. In response to the First Discrimination Complaint, Hurricane did not interview Watterson.

55. In response to the First Discrimination Complaint, Hurricane did not interview Bradford.

56. In response to the First Discrimination Complaint, Hurricane did not interview Denton.

57. In response to the First Discrimination Complaint, Hurricane did not interview Grant.

58. In response to the First Discrimination Complaint, Hurricane did not interview any witnesses at all.

59. In response to the First Discrimination Complaint, Hurricane did not get a written statement from Watterson.

60. In response to the First Discrimination Complaint, Hurricane did not get a written statement from Bradford.

61. In response to the First Discrimination Complaint, Hurricane did not get a written statement from Johnson.

62. In response to the First Discrimination Complaint, Hurricane did not get a written statement from Denton.

63. In response to the First Discrimination Complaint, Hurricane did not get a written statement from Grant.

64. Upon information and belief, Hurricane has a progressive disciplinary policy.

65. Hurricane did not give Grant a verbal warning as a result of the First Discrimination Complaint.

66. Hurricane did not give Denton a verbal warning as a result of the First Discrimination Complaint.

67. Hurricane did not give Grant a written warning as a result of the First Discrimination Complaint.

68. Hurricane did not give Denton a written warning as a result of the First Discrimination Complaint.

69. Hurricane did not give Grant a final written warning as a result of the First Discrimination Complaint.

70. Hurricane did not give Denton a final written warning as a result of the First Discrimination Complaint.

71. Hurricane did not suspend Grant as a result of the First Discrimination Complaint.

72. Hurricane did not suspend Denton as a result of the First Discrimination Complaint.

73. Hurricane did not terminate Grant as a result of the First Discrimination Complaint.

74. Hurricane did not terminate Denton as a result of the First Discrimination Complaint.

75. Hurricane did not discipline Grant at all as a result of the First Discrimination Complaint.

76. Hurricane did not discipline Denton at all as a result of the First Discrimination Complaint.

77. By failing to take action to correct or eliminate the discriminatory and harassing conduct of Grant and Denton, Defendants condoned and endorsed their conduct.

78. Watterson and Bradford were disappointed that Swain had refused to take stronger action against Grant and Denton.

79. In the months that followed, Watterson and Bradford continued to witness Hurricane employees, including Grant, making offensive, discriminatory remarks.

80. On several occasions, Denton remarked about how she did not trust "black men" and continued to complain about others speaking Spanish.

81. On another occasion, another Medical Assistant, Ericka Beers, shared her dislike of "dykes" with Grant in front of Watterson and Bradford.

82. Grant responded to Beer's "dyke" remark by sarcastically stating "you can't say that! Well, you can't say that here" while looking directly at Watterson and Bradford and rolling her eyes.

83. Grant was referring to Watterson and Bradford's First Discrimination Complaint when she directed her gaze at Watterson and Bradford and sarcastically stated "Well, you can't say that here" and rolled her eyes.

84. Watterson and Bradford later learned that Beers and Grant had exchanged anti-LGBTQ+ messages with one another on Facebook during work hours:

 

85. In addition to making inappropriate remarks, Grant targeted African American employee like Watterson and Johnson for harsher treatment.

86. Grant would yell and scream at Watterson and Johnson and disciplined them for making mistakes similar to those made by Kaitlynn, yet Kaitlynn was not subjected to the same treatment by Grant.

87. As a result of Grant, Denton, and Beers' hateful, discriminatory, and backwards attitudes towards African Americans, Hispanics, and the LGBTQ+ community, Plaintiffs and Johnson decided that they could no longer work for Hurricane unless Swain took action to address the inappropriate and hostile work environment that Grant, Denton, and Beers had created.

88. On or about October 19, 2021, Plaintiffs and Johnson submitted a joint resignation letter ("Resignation Letter") to Swain, in which they stated:

> …we can no longer work for here any longer due [sic] to the hostile work environment. This is due to your overtly racist, homophobic, transphobic office manager, and other staff. We also have concerns about repeated demeaning and belittling of staff. There is also concern about the continuance of being singled out and targeted.

89. The Resignation Letter explicitly complains about Grant and other employees being "racist, homophobic, transphobic" and states that it has created a hostile work environment.

90. The Resignation Letter provided a "last day" of November 15, 2022 – nearly a month out from the date Plaintiffs and Johnson submitted it.

91. Plaintiffs and Johnson established a "last date" of nearly a month after the Resignation Letter because they hoped their threat to resign would prompt Swain to take their complaints more seriously.

92. Plaintiffs and Johnson intended to rescind or walk back their threat to resign if Swain took action.

10

93. Swain responded to the Resignation Letter by inviting Plaintiffs and Johnson to have lunch with him to discuss it ("Lunch Meeting").

94. Watterson made an audio recording of the Lunch Meeting.

95. During the Lunch Meeting, Swain acknowledged that Plaintiffs and Johnson's Complaint about discriminatory and harassing conduct by Grant and other employees, that "you have to tell the person that you are having a problem with. That is the only way that…that is appropriate, to be honest with you, without informing this person that this is the way we feel, that is not actually fair."

96. Swain seemed more concerned during the lunch meeting that Plaintiffs and Johnson had not first confronted Grant than the fact that Hurricane's office manager – Grant – was creating hostile work environment.

97. Swain then warned Plaintiffs and Johnson that "you're going to have a hard time finding a job where you have a boss…like myself."

98. Swain promised to be more "present" at Hurricane and that as a result, "these shenanigans won't be happening."

99. Swain added that "to be honest, these kinds of things happen when the boss is not around…this happens everywhere, not just here."

100. Swain appears to believe that employees at all businesses engage in discrimination and unlawful harassment when "the boss is away."

101. Swain stated that going forward, if he heard someone "making snide comments about Hispanic workers, they are going to get chewed out by me."

102. Swain concluded the lunch meeting by asking Plaintiffs and Johnson to let him know if they would rescind their resignations and if so, that he would schedule a meeting with Grant.

103. As Swain, Plaintiffs, and Johnson left the Lunch Meeting, Swain suddenly remarked "what other racist things were there...I remember the whole, you know, Juneteenth thing."

104. While ignoring his own failure to properly address Grant and Denton's behavior in June of 2021, Swain tried to shift blame to Plaintiffs and Johnson for "allowing it to happen" because they did not say anything to Grant.

105. Shortly after the Lunch Meeting, Plaintiffs notified Swain that they were willing to give Hurricane a "third chance" if Swain would promise to address the unlawful, offensive conduct of Grant, Denton, and Beers ("Recission Meeting").

106. Plaintiffs and Swain further discussed Plaintiff's desire to eliminate unlawful discrimination and harassment in the workplace during the Recission Meeting.

107. Plaintiffs stressed to Swain that they believed a meeting with Grant would not be sufficient; that Grant had clearly not learned from the First Discrimination Meeting; and that Grant should be terminated.

108. Swain stopped short of promising to terminate Grant but told Plaintiffs that he took their complaint seriously and that he would "deal with [Grant]."

109. Watterson attempted to audio record her and Bradford's notice to Swain that they were rescinding their resignations but later learned that her phone had failed to record.

110. A few hours after Plaintiffs notified Swain that they were rescinding their resignations, at the end of the business day, Swain summoned Plaintiffs and Johnson to his office ("Final Meeting").

111. Watterson was able to successfully audio record the Final Meeting.

112. During the Final Meeting, Swain said that he believed that "maybe it is in the best interest of the company as well as everyone that we move forward with your guys resignation effective immediately."

113. Swain justified his decision to terminate Plaintiffs and Johnson by stating that he believed that "…going forward, I believe the working environment would be extremely toxic…I don't think its going to work very well, its going to be a very difficult situation."

114. Watterson responded to learning of her termination by asking "why are we being punished" because she believed "it seemed like we had a pretty good conversation" during the Recission Meeting.

115. Swain responded that he "understood" but "I talked to you guys about wanting to resolve that situation and I don't really think that you guys are interested in doing that…the situation is beyond repair."

116. Swain had decided that he would rather retain Grant – an employee he knew to have a history of inappropriate, discriminatory conduct in the workplace – over Plaintiffs, who had asked that Grant be terminated in exchange for their willingness to continue working for Hurricane.

117. Swain had decided that it was preferable to get rid of employees who had engaged in protected activity as part of an effort to improve their and other employee's working conditions than to get rid of an employee he knew had engaged in discriminatory, unlawful conduct.

118. Watterson was not terminated because of her work performance.

119. Watterson was not terminated because of her attendance record.

120. Watterson was not terminated for violating any workplace rules.

121. Watterson was not terminated for misconduct.

13

122. Denton was not terminated because of her work performance.

123. Denton was not terminated because of her attendance record.

124. Denton was not terminated for violating any workplace rules.

125. Denton was not terminated for misconduct.

126. There is no dispute in this matter that Swain terminated Plaintiffs specifically because of their protected complaints regarding Grant's discriminatory treatment of African American employees and her and certain co-workers daily use of racist, xenophobic, transphobic, and homophobic language in the workplace.

127. Plaintiffs were terminated in retaliation for their complaints about a hostile work environment created by the racist, xenophobic, transphobic, and homophobic conduct of Grant and others in the workplace.

128. On or about April 20, 2022, Defendants responded to Plaintiffs' OCRC charge ("OCRC Response").

129. In the OCRC response, Defendants claimed to have "a **ZERO TOLERANCE** policy for discriminatory behavior at [Hurricane]."[1]

130. Defendants did not demonstrate "**ZERO TOLERANCE**" of Grant and Denton's discriminatory behavior when they responded to Grant and Denton undisputed racist remarks about Juneteenth with nothing more than a slap on the wrist.

131. Contrary to showing "**ZERO TOLERANCE**," Defendants' conduct tolerated and condoned the conduct of Grant and other employees who made improper, discriminatory remarks.

---

[1] **EMPHASIS** in original.

132. In the OCRC Response, Defendants falsely claimed that "Swain had no prior knowledge of discriminatory behavior towards the plaintiffs at any time until the two employees submitted a resignation letter to him"

133. Defendants' claim in the OCRC Response that Swain had no prior knowledge of Grant's discriminatory conduct is disproven by his involvement in Plaintiffs' First Discrimination Complaint, which Swain expressly acknowledge on Watterson's audio recording during the Lunch Meeting.

134. In the OCRC Response, Defendants claimed that Grant had been terminated as a result of the complaints Plaintiffs made about Grants discriminatory conduct in their Resignation Letter.

135. Upon information and belief, Grant was not terminated until Defendants learned that Plaintiffs were contemplating legal action in or around April of 2022.

136. At all times referenced herein, Plaintiff were non-exempt, hourly employees.

137. Plaintiffs regularly worked in excess of 40 hours per work week.

138. Defendants failed to pay Plaintiffs overtime at a rate of one and one-half times their regular rate of pay, instead opting to pay Plaintiffs a flat per hour rate for all hours worked, including those worked over 40 in a single work week.

139. Defendants' failure to pay overtime was willful, reckless and knowing, and occurred without a good faith belief that it was lawful to refuse to pay overtime.

## COUNT I: HOSTILE WORK ENVIRONMENT BASED ON RACE IN VIOLATION OF 4112.02(A). (Asserted By Watterson Against Hurricane Only).

140. Watterson re-alleges and incorporates by reference the allegations set forth in paragraphs 1-139, above.

141. During her employment with Hurricane, Watterson was subjected to daily offensive and harassing conduct by the Grant based on her race, African American.

142. The discriminatory statements and treatment Grant repeatedly subjected Watterson to was unwelcome; detrimentally affected Watterson; was viewed as subjectively hostile and abusive by Watterson, would be viewed as objectively hostile and abusive to a reasonable person; and was sufficiently severe and/or pervasive to create a hostile work environment.

143. Hurricane knew or should have known of the harassing conduct against Watterson by Grant.

144. Hurricane condoned, tolerated and ratified Grant's harassing conduct.

145. Hurricane's creation and tolerance of a racially hostile work environment violated of the rights secured to Watterson by Ohio R.C. § 4112.02(A).

146. Watterson was forced to resign her employment as a result of the Grant's racially motivated harassment against him, only to be terminated after she attempted to rescind her resignation based on Swain's promises to put a stop to Grant's harassing behavior.

## COUNT II: RETALIATION IN VIOLATION OF 42 U.S.C. § 1981.
### (Asserted By Watterson Against All Defendants).

147. Watterson re-alleges and incorporates by reference the allegations set forth in paragraphs 1-146, above.

148. Defendants violated Section 1981 by terminating Watterson's employment because she made protected complaints of unlawful, racially motivated discrimination and harassment at Hurricane by Grant and other employees.

149. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Watterson has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

16

150. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Watterson has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

151. Defendants' unlawful retaliatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Watterson, and was done with conscious disregard of Watterson's civil rights, entitling Watterson to an award of punitive damages.

152. To remedy the violations of the rights of Watterson secured by Section 1981, Watterson requests that the Court award her the relief prayed for below.

**COUNT III: RETALIATION IN VIOLATION OF 42 U.S.C. § 1981.**
**(Asserted By Bradford Against All Defendants).**

153. Bradford re-alleges and incorporates by reference the allegations set forth in paragraphs 1-152, above.

154. Defendants violated Section 1981 by terminating Bradford's employment because she made protected complaints of unlawful, racially motivated discrimination and harassment at Hurricane by Grant and other employees.

155. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Bradford has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which he is entitled to an award of monetary damages and other relief.

156. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Bradford has suffered and continues to suffer severe mental anguish and

emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

157. Defendants' unlawful retaliatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Bradford, and was done with conscious disregard of Bradford's civil rights, entitling Bradford to an award of punitive damages.

158. To remedy the violations of the rights of Bradford secured by Section 1981, Bradford requests that the Court award her the relief prayed for below.

## COUNT IV: RETALIATION IN VIOLATION OF O.R.C § 4112.02(I).
### (Asserted By Watterson Against All Defendants).

159. Watterson re-alleges and incorporates by reference the allegations set forth in paragraphs 1-158, above.

160. Pursuant to O.R.C. § 4112.02(I), it is unlawful "for any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code."

161. Watterson engaged in activity protected by O.R.C. § 4112.02(I) when she made the First Discrimination Complaint and when she again complained about unlawful discrimination and harassment in October of 2021.

162. Defendants retaliated against Watterson for complaining about discrimination and harassment by terminating her employment.

163. Defendants told Watterson that the reason for her termination was that it would be "extremely toxic" and "difficult" to allow her - as someone who had complained about the discriminatory and harassing conduct of Grant and others - to remain employed.

164. Defendants violated O.R.C. § 4112.02(I) when they retaliated against Watterson by terminating her employment.

165. As a result of Defendants' retaliation against Watterson in violation of O.R.C. § 4112.02(I), Watterson was denied employment opportunities providing substantial compensation and benefits, thereby entitling Watterson to compensatory monetary relief.

166. As a result of Defendants' retaliation against Watterson in violation of O.R.C. § 4112.02(I), Watterson has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

167. In its retaliatory actions as alleged above, Defendants acted with malice or reckless indifference to the rights of Watterson, thereby entitling Watterson to an award of punitive damages.

168. To remedy the violations of the rights of Watterson secured by O.R.C. § 4112.02(I), Watterson requests that the Court award her the relief prayed for below.

## COUNT V: RETALIATION IN VIOLATION OF O.R.C § 4112.02(I).
### (Asserted By Bradford Against All Defendants).

169. Bradford re-alleges and incorporates by reference the allegations set forth in paragraphs 1-168, above.

170. Pursuant to O.R.C. § 4112.02(I), it is unlawful "for any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated

in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code."

171. Bradford engaged in activity protected by O.R.C. § 4112.02(I) when she made the First Discrimination Complaint and when she again complained about unlawful discrimination and harassment in October of 2021.

172. Defendants retaliated against Bradford for complaining about discrimination and harassment by terminating her employment.

173. Defendants told Bradford that the reason for her termination was that it would be "extremely toxic" and "difficult" to allow her - as someone who had complained about the discriminatory and harassing conduct of Grant and others - to remain employed.

174. Defendants violated O.R.C. § 4112.02(I) when they retaliated against Bradford by terminating her employment.

175. As a result of Defendants' retaliation against Bradford in violation of O.R.C. § 4112.02(I), Bradford was denied employment opportunities providing substantial compensation and benefits, thereby entitling Bradford to compensatory monetary relief.

176. As a result of Defendants' retaliation against Bradford in violation of O.R.C. § 4112.02(I), Bradford has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

177. In its retaliatory actions as alleged above, Defendants acted with malice or reckless indifference to the rights of Bradford, thereby entitling Bradford to an award of punitive damages.

178. To remedy the violations of the rights of Bradford secured by O.R.C. § 4112.02(I), Bradford requests that the Court award her the relief prayed for below.

## COUNT VI: VIOLATION OF THE FAIR LABOR STANDARDS ACT BASED ON THE FAILURE TO PAY OVERTIME.
### (Asserted By Watterson Against All Defendants).

179. Watterson re-alleges and incorporates by reference the allegations set forth in paragraphs 1-178, above.

180. The FLSA requires each covered employer, such as Defendants, to compensate all non-exempt employees at a rate of not less than 1.5 times the regular rate of pay for work performed in excess of 40 hours in a work week.

181. At all times referenced herein, Watterson was non-exempt from the overtime provision of the FLSA.

182. Watterson regularly worked in excess of forty (40) hours per week but Defendants failed to pay her overtime.

183. Defendant's pay practices with respect to overtime was not accidental or based on a good-faith interpretation or understanding of the FLSA; Defendants deliberately concocted a scheme to deprive Watterson of the overtime pay she earned.

184. Defendant never received any legal advice from an attorney or law firm that it was lawful to not pay persons occupying the position held by Watterson overtime.

185. Defendants failure to pay overtime to its employees was never audited, reviewed, or approved of by the Department of Labor.

186. Defendants did not rely on any Department of Labor regulation or opinion letters to devise or create their overtime policies and/or practices with respect to the Receptionist position.

187. Because Defendant's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

188. Watterson is entitled to all legal and equitable remedies available for violations of the FLSA, including, but not limited to, back pay, liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and litigation costs, and other compensation pursuant to the FLSA.

## COUNT VII: VIOLATION OF THE FAIR LABOR STANDARDS ACT BASED ON THE FAILURE TO PAY OVERTIME.
### (Asserted By Bradford Against All Defendants).

189. Bradford re-alleges and incorporates by reference the allegations set forth in paragraphs 1-188, above.

190. The FLSA requires each covered employer, such as Defendants, to compensate all non-exempt employees at a rate of not less than 1.5 times the regular rate of pay for work performed in excess of 40 hours in a work week.

191. At all times referenced herein, Bradford was non-exempt from the overtime provision of the FLSA.

192. Bradford regularly worked in excess of forty (40) hours per week but Defendants failed to pay her overtime.

193. Defendant's pay practices with respect to overtime was not accidental or based on a good-faith interpretation or understanding of the FLSA; Defendants deliberately concocted a scheme to deprive Bradford of the overtime pay she earned.

194. Defendant never received any legal advice from an attorney or law firm that it was lawful to not pay persons occupying the position held by Bradford overtime.

195. Defendants' failure to pay overtime to its employees was never audited, reviewed, or approved of by the Department of Labor.

196. Defendants did not rely on any Department of Labor regulation or opinion letters to devise or create their overtime policies and/or practices with respect to the Receptionist position.

197. Because Defendant's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

198. Bradford is entitled to all legal and equitable remedies available for violations of the FLSA, including, but not limited to, back pay, liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and litigation costs, and other compensation pursuant to the FLSA.

**COUNT VIII: VIOLATION OF THE OHIO MINIMUM FAIR WAGE STANDARDS ACT, O.R.C. §§ 4111.03,, *et seq*, BASED ON FAILURE TO PAY OVERTIME. (Asserted By Watterson Against All Defendants).**

199. Watterson re-alleges and incorporates by reference the allegations set forth in paragraphs 1-198, above.

200. At all relevant times, Defendants have been, and continue to be, an "employer" within the meaning of the Ohio Minimum Fair Wage Standards Act ("OMFWSA").

201. At all relevant times, Defendants employed and continues to employ, "employees," within the meaning the OMFWSA.

202. Watterson was an employee of Defendants as that term is defined by the OMFWSA.

203. Ohio R.C. § 4111.03 provides that "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's wage rate for hours worked in excess of forty hours in one workweek, in the manner and methods provided in and subject to the exemptions of section 7 and section 13 of the [FLSA]…"

204. Defendants failed to pay Watterson overtime compensation for all hours she worked in excess of 40 per week.

205. In denying Watterson overtime compensation, Defendants violated the OMFWSA and Article II, Section 34a of the Ohio Constitution.

206. As a direct and proximate result of Defendants' unlawful conduct, Watterson has suffered and will continue to suffer a loss of income and other damages.

207. Having violated the OMFWSA, Defendants are liable to Watterson pursuant to O.R.C. § 4111.10 for the full amount of her unpaid overtime and for costs and reasonable attorneys' fees.

## COUNT IX: VIOLATION OF THE OHIO MINIMUM FAIR WAGE STANDARDS ACT, O.R.C. §§ 4111.03,, *et seq*, BASED ON FAILURE TO PAY OVERTIME. (Asserted By Bradford Against All Defendants).

208. Bradford re-alleges and incorporates by reference the allegations set forth in paragraphs 1-207, above.

209. At all relevant times, Defendants have been, and continue to be, an "employer" within the meaning of the Ohio Minimum Fair Wage Standards Act ("OMFWSA").

210. At all relevant times, Defendants employed and continues to employ, "employees," within the meaning the OMFWSA.

211. Bradford was an employee of Defendants as that term is defined by the OMFWSA.

212. Ohio R.C. § 4111.03 provides that "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's wage rate for hours worked in excess of forty hours in one workweek, in the manner and methods provided in and subject to the exemptions of section 7 and section 13 of the [FLSA]…"

213. Defendants failed to pay Bradford overtime compensation for all hours she worked in excess of 40 per week.

214. In denying Bradford overtime compensation, Defendants violated the OMFWSA and Article II, Section 34a of the Ohio Constitution.

215. As a direct and proximate result of Defendants' unlawful conduct, Bradford has suffered and will continue to suffer a loss of income and other damages.

216. Having violated the OMFWSA, Defendants are liable to Bradford pursuant to O.R.C. § 4111.10 for the full amount of her unpaid overtime and for costs and reasonable attorneys' fees.

### COUNT X: VIOLATION OF THE OHIO PROMPT PAY ACT.
### (Asserted By Watterson Against Hurricane Only).

217. Watterson re-alleges and incorporates by reference the allegations set forth in paragraphs 1-216, above.

218. The Ohio Prompt Pay Act ("OPPA") required Hurricane to pay Watterson all wages on or before the first day of each month, for wages earned by Watterson during the first half of the preceding month ending with the fifteenth day thereof, and on or before the fifteenth day of each month, for wages earned by Watterson during the last half of the preceding calendar month. See O.R.C. § 4113.15(A).

219. Watterson was not paid all wages due, i.e, overtime, within 30 days of her performing the work that entitled her to the wages. See R.C. §4113.15(B).

220. Watterson unpaid overtime remains unpaid for more than 30 days beyond her regularly scheduled payday.

221. Watterson has been harmed and continues to be harmed by Hurricane's acts and/or omissions as described herein and is entitled to the greater of $200.00 or an additional six percent on the total amount of wages due. See O.R.C. § 4113.15(C).

## COUNT XI: VIOLATION OF THE OHIO PROMPT PAY ACT.
### (Asserted By Bradford Against Hurricane Only).

222. Bradford re-alleges and incorporates by reference the allegations set forth in paragraphs 1-222, above.

223. The Ohio Prompt Pay Act ("OPPA") required Hurricane to pay Bradford all wages on or before the first day of each month, for wages earned by Bradford during the first half of the preceding month ending with the fifteenth day thereof, and on or before the fifteenth day of each month, for wages earned by Bradford during the last half of the preceding calendar month. See O.R.C. § 4113.15(A).

224. Bradford was not paid all wages due, i.e, overtime, within 30 days of her performing the work that entitled her to the wages. See R.C. §4113.15(B).

225. Bradford unpaid overtime remains unpaid for more than 30 days beyond her regularly scheduled payday.

226. Bradford has been harmed and continues to be harmed by Hurricane's acts and/or omissions as described herein and is entitled to the greater of $200.00 or an additional six percent on the total amount of wages due. See O.R.C. § 4113.15(C).

## PRAYER FOR RELIEF.

WHEREFORE, Plaintiffs Shawnda Watterson and Kaitlynn Bradford requests judgment in their favor against Defendants, containing the following relief:

(a) A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States;

(b) An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

(c) An order directing Defendants to place Plaintiffs in the position each would have occupied but for Defendants' discriminatory, retaliatory and/or otherwise unlawful treatment of them, as well as to take such affirmative action as is necessary to ensure that the effects of

26

these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Plaintiffs;

(d)    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

(e)    Awarding against each Defendant compensatory and monetary damages to compensate Plaintiffs for lost wages, emotional distress, and other consequential damages, in an amount to be proven at trial;

(f)    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

(g)    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for harm to their professional and personal reputation and loss of career fulfillment;

(h)    An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiffs in an amount to be determined at trial, plus prejudgment interest;

(i)    Awarding Plaintiffs unpaid overtime wages and an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b);

(j)    Awarding Plaintiffs all damages and remedies provided for under Ohio R.C. § 4111.03 and 4113.15, *et seq*,

(k)    An award of punitive damages;

(l)    An award of costs that Plaintiffs have incurred in bringing this action, as well as Plaintiffs' reasonable attorneys' fees to the fullest extent permitted by law; and

(m)    Awarding such other and further relief that this Court deems necessary and proper.

Respectfully submitted,

/s/ Chris P. Wido
Chris P. Wido (0090441)
**SPITZ, THE EMPLOYEE'S LAW FIRM**
25825 Science Park Drive, Suite 200
Beachwood, OH 44122
Phone: (216) 291-4744
Fax:    (216) 291-5744
Email: chris.wido@spitzlawfirm.com

*Attorney for Plaintiffs Shawnda Watterson and Kaitlynn Bradford*

## JURY DEMAND

Plaintiffs Shawnda Bradford and Kaitlynn Bradford demands a trial by jury by the maximum number of jurors permitted.

/s/ Chris P. Wido
Chris P. Wido (0090441)
**SPITZ, THE EMPLOYEE'S LAW FIRM**